and CUNA Supply, 2019-13-37. Mr. Whitcomb, when you are ready. If it pleases the Court, my name is Joe Whitcomb. I represent the appellant, in this case Office Design Group. I'm going to try to be as concise as I can. I want to give the Court just a little bit of context. This is obviously a bid protest case involving a half-a-billion-dollar multi-region, what essentially boils down to a national blanket purchase agreement, under which the awardees, if admitted under that blanket purchase agreement, would then have the authorization, if you will, to bid on following task orders. The issues in this case are unusual in that there were nine awardees in this case. I'm sure the Court's already aware of this. Four of which submitted, and we are careful to use the terms nearly identical proposals in our briefings, but the only distinctions in those proposals as it relates to the technical proposal have to do with the flower names of the contractors, which were given, I think for the purpose of anonymity, they were to use primroses and other things to identify themselves versus their names. Other than that, the four of the nine awardees' proposals were the same as we detailed in our briefings, right down to page numbers, Ambersands, they were identical. Originally, when we saw that, again, as we briefed, our first suspicion was some evidence of collusion, but what seems to have borne out in the administrative record that it was simply a function of the four offerors hiring the same proposal writer for the purpose of putting together their proposal, which... But counsel, your client didn't get a very good score. No, that's correct, Your Honor, and that's, of course, why we're here. It was something that was very important. It got a score of 12 out of 36, is that right? It was actually a score of 12 out of 66, Your Honor. It needed a 39 to be an awardee. The, and the entire, the entirety of our briefings historically have been office design group, in this instance, was singled out. Language that was nearly identical to awardees was not given points, and the offers, the awardees were given points, and not just partial points. In most of those instances, they were given six points. And what I want, what I'm hoping to point, you know, there's an old saying we taught in law school that bad facts make for bad law. This may be an instance where the law has made for, and not bad law, but the law has made for some bad facts. So the case law that the government cites to a number of times in its briefing says that in order for the court to second guess or to rule on the issue of disparate treatment, the proposals have to be nearly identical. Well, in this instance, we have four proposals that are actually identical, which begs the question. The question isn't whether the winning proposals are nearly identical. It's whether the winning, the proposals that won are disparate from yours and are nearly identical. And the government and the Court of Federal Claims believe they weren't nearly identical. Isn't that correct? And didn't the Court of Federal Claims go through in fairly excruciatingly detail why on each section where you got no points or lower points, and that other group got higher points, that the VA had a reason, and that reason wasn't arbitrary or capricious? Right. And I agree with you, Your Honor, that that is what the lower court said. And that's obviously why we're here, that we disagree with the lower court's findings in that instance. And the reason we find is that the differences that the court pointed out respectfully were differences without a distinction. So in other words, this understanding contextually that this is a blanket purchase agreement and an indefinite date, indefinite quantity contract with no specifics as it relates to the actual furniture to be designed and delivered, any level of specificity with which Office Design Group or any other offer could have submitted proposals would have been guessing at best. And the best proof of that, Your Honor, is if you look at the individual... Isn't that true in a lot of these contracts? What they're doing is saying and describing their ability to meet future requirements. And the government gives you a proposal and solicitation and says, describe to us in an appropriate level of details on how you're going to do it. In this case, they found you didn't describe an appropriate level of some details and the other people did. Except that, Your Honor, in this instance, they found the opposite. In the specific... Where Office Design Group was afforded specifics to submit a proposal, how would you handle this particular problem? Office Design Group did so and got an excellent mark for that portion of their proposal. So where Office Design Group was given a specific example of how they were going to satisfy a requirement. I don't think we're talking about the portions where you got excellent remarks. We're talking about the portions where you got bad marks and whether that was arbitrary. And the reason, again, that we're here and we're arguing that it was in fact arbitrary is because, for example, as we've detailed in our reply briefs and our opening brief in some detail, in examples where it's cited in the appendix, where the contracting officer, source selection authority, gave a Pomerantz credit, as an example, and cited to a provision in their proposal, where that was great and satisfactory. When you look to that citation in the proposals, it actually doesn't say what the government says it does. In fact, an example of that is actually in the government's briefing. In page 25 of the government's briefing, it plays a role of apologist for a Pomerantz, where it says that... I'm not so interested in talking about the other offerers' deficiencies because the trial court acknowledged that there were some deficiencies there, but that they weren't enough to demonstrate disparate treatment. What you need to show us, because you got 12 out of 66 or something like that, where the government made arbitrary grading errors on your proposal. And Your Honor, that's actually... Thank you. That's kind of where we're going. In each one of these instances where they weren't rated, they would have been afforded essentially 18 or six points. So, there was two points in three different sections of the rubric. And so, in an instance where they were given zero points, where their competitors were given two points, two of the available points, the discrepancy... Wait, did you just say you would have gotten 18 points? In the example of... In just three examples, we've cited seven examples in our briefings. We only need to understand, we only needed to get to 39 to get the quote-unquote passing grade. Again, part of what we've argued in our briefings is that passing... I mean, you are arguing in very large generalities. Do you have a specific point where you think the VA arbitrarily did not give you points when your proposal under the solicitation terms and that attachment should have given you points? Yes. And Your Honor, to my knowledge, some of those are cited in great detail in our opening and reply brief, which I have open and I'm happy to cite to. But in our opening brief, we cite seven separate examples. And didn't the trial court go through all of that stuff and disagree with you and say the VA's reasoning here is not arbitrary and supported by substantial evidence? And Your Honor, again, to the degree that that is a legal conclusion, which we find, which we argue it is, then it is up for de novo review by this court, to the degree that... Sure. But you're now almost nine minutes in and you have yet to argue where a single point is not supported by substantial evidence. Yeah. Your Honor, I respectfully disagree in that we've cited these examples in our briefings as it relates to... I understand, but your point, your opportunity here is to convince me why the VA was arbitrary. And you haven't actually identified. Do you want to talk about the staffing plan and the key personnel plan? Because that's a zero point and the other people got two points, right? In that example, Your Honor, you just brought up a staffing plan. That is the closest example of office design group being essentially identical to the offers who were given... Well, that's not the finding of the trial court and that's not the finding of the VA, right? The finding of them is that you submitted a staffing plan that couldn't be compared to the others because it didn't say anything in particular about your staff's qualification. And Your Honor, again, I believe that the lower court was applying a level of deference to the Veterans Administration that doesn't belong in this particular case because the level of deference that the court... Is it true that your plan didn't say very much about staff qualifications? No, it didn't. That's supported by the substantial evidence? No, that is actually untrue. In fact, as we detailed in our briefing, office design group pointed out the number of years that the individuals held and the key personnel and provided a staffing plan. And the offers who were afforded six points sometimes did nothing more than offer a treat of personnel. And this is the personnel that they'll be working on, I think. Counselor, wouldn't you say that... Let's take, for example, the staffing plan. Yes. That's a technical provision that requires subjective analysis. Your Honor, again, where I was going with Judge Hughes is that that's a level of deference that is typically afforded a contracting officer in a negotiated procurement, where in this instance, we're talking about a blanket purchase agreement where... When you're looking at a staffing plan... Yes, sir. Aren't you engaged in a subjective analysis? I mean, it doesn't say you must have 25 vice presidents and we're reviewing whether you had 23 or 24. It's reviewing the sufficiency of your staffing plan. That's subjective in nature, isn't it? Yes, Your Honor, but the first... You started out with our standard review. So if it's subjective in nature, what's your standard of review in this situation? Your Honor, the case law holds that the standard of review for subjective is highly differential. Okay. It's highly differential, correct? Yes, Your Honor. It is highly differential. But that doesn't... Highly differential doesn't mean that the contracting officer's decision is beyond review. It's just highly differential. So what reason did they give here for finding your staffing plan deficient? One was brevity, Your Honor. Simply brevity. It was just not enough in their... That's not the only reason, is it? And it cited a lack of specificity as it relates to the individual, which is, again... It didn't talk about their experience enough. It did not talk... It talked about the lack of detail as it relates to experience. Right. Well, doesn't A in that checklist say, provide a staffing plan to include qualifications and experience working in a healthcare environment? And Your Honor, that is why the crutch of our argument is in the disparity of the treatment. Whatever is lacking in Office Design Group's proposal in that staffing plan is lacking in at least three of the offers. And I'm well into my rebuttal time. I'm happy to continue to answer questions, but I wanted to reserve three minutes. But the point I'm making is the deficiencies... And the government's answer for that... The government's response is, well, if a Pomerantich or one of the other offers was deficient, then the solution is to lower their score, not raise Office Design Group's score. And our position is that answer ignores the disparity of the treatment. So again, taking in the aggregate, the way that Office Design Group was treated in its evaluation was woefully disparate, in our opinion, from the way the other offers were. In each one of the examples that we cited, warranties, how, for example, Office Design Group was going to... This is another example in our briefings, but I'll... How Office Design Group was going to protect furniture. The obvious question is which furniture and which scenarios. But Office Design Group provides an answer that it was going to comply with all the rules and all the safety issues. One of the other offers said, we're going to make sure everything's warrantied. Also, why don't we save two minutes of rebuttal for you? I'm sorry. Ms. Koenig. We didn't get a whole lot of specificity from him, but at least there at the end, we talked about his argument that they were disparately treated in the staffing plans and the process for protecting furniture. And that they didn't get points and the other people gave identically deficient answers and got points. Were the answers identical? Your Honor, the answers were not identical. And what was the difference in your view that allowed the other parties to get points and them not to get points? Well, Your Honor, if you were to look at page 98 of the appendix, which is part of ODG's Office Design Group service narrative, which is where they address their staff, they have a section called qualified staff, which states that the project managers have at least 10 years experience, that the interior designers have at least 10 years experience, and that installation supervisors have at least five years experience. None of the experience specifically references health care, which the agency and the trial court found to be deficient. And the agency found that this was not a staffing plan, like the other offers submitted. For example, one of the offers, awardees that ODG compares itself to is A. Pomerantz. On page 30 of their service narrative, appendix page 30, they reference that they have 28 years of experience and that that experience includes broad health care experience. A. Pomerantz also included a staffing plan at pages 36 through 38 of the appendix in their service narrative as well. The other awardee that ODG compares itself to, Veteran Office Design, references the type of experience, including qualifications and accreditation for its key personnel at pages 66, 71, 76, and 80 of the appendix. And these are, again, just the examples as to the first key element as to the staffing plan. But throughout our brief, we've explained why for each of the eight key elements, Office Design Group's service narrative was in fact deficient. And we have also compared why the awardees' service narratives were not in fact identical to, or even substantively indistinguishable from ODG's service narrative as the case law requires. The last point that the Appellant's Council raised was as to the prejudice issue. And the trial court found that ODG didn't suffer any prejudice. Because, again, to the extent that their, that ODG's argument is that other awardees' proposals were equally deficient or equally vague, again, the result would be to reduce their scores, not raise ODG's scores. Well, how do we know that? I think this is a harder argument for you. We don't have to get to this if we decide that their proposals are different enough and that those conclusions are not arbitrary for purposes supported by substantial evidence, right? That's correct, Your Honor. Is there anything in the record that suggests that if there actually had been identical statements on both sides, that the VA would have reduced the winning offers or that they might have bumped up them? I don't know that there's anything in the record other than the statements in the evaluation document. I mean, it seems to me that if we got to that point, wouldn't it be better, of course, to send it back and ask the VA to at least explain whether it would choose the course of bumping the others down? Because this is, as is pretty clear, a fairly major procurement. And they may not want to, on some of these things, not have any qualifying offers or not have enough if they decide to, you know, find the other people deficient. They may decide, well, maybe we should just give all of them points. Well, Your Honor, and I don't think that we need to get there in this case, because Well, at least the points you just pointed to on the staffing, they seem significantly different. They have a very generic four-line thing about years of experience that doesn't, I think, even really discuss health care. The other two you pointed us to have, you know, not just years of experience, but specific examples of the types of health care experience they have. That's correct, Your Honor. And, you know, I could also explain or run through some of the differences or deficiencies regarding the furniture installation, which I know that Office of Assigned Groups Counsel did. It's all in the briefs, right? It is all in the briefs. The trial court went through this in a fairly extensive detail and looked at each of these and said, no, these aren't different. And so there is a basis for the differing scores, and it's not arbitrary and capricious. That's correct, Your Honor. That's our briefs. Just one last point I want to make, unless Your Honors have any other questions. The Appellant's Counsel raised at the beginning the four offerors that were similar. First, I want to note that that's an issue that they haven't raised on appeal specifically. I know they've mentioned it throughout their briefing, but did not specifically appeal the issue. Well, it seems like it's a pretty harmless explanation, anyway, that they all use the same Correct, Your Honor. offer preparer. Is there any rules against that? That seems a little jinky to me, that the same bid preparer can prepare multiple things for the same solicitation. Are you aware of anything in procurement law or the VA specific that prohibits that? I'm not aware of anything that would specifically prohibit it, but I will note that, as the trial court found, the VA referred the matter to DOJ to conduct an investigation, and that was all that the VA was required to do to conform with the FAR. But those four awardees aren't really even the awardees to which ODG compares itself in its briefs, and so we just don't think there's really any merit to that claim. So unless Your Honors have any further questions, I will sit down. Thank you, Counsel. Mr. Whitcomb has some rebuttal time. Thank you, Your Honor. The only reason that Appellate Counsel raises the issue of the four identical proposals is to point out what is the contracting officer supposed to learn from the proposals, which is whether or not the offerors had the capacity to do the job that they're being hired to do. And was the contracting officer supposed to, in this instance, assume, for example, that all four of those offers were going to satisfy the staffing plan in exactly the same way with the exact same level of experience, or they were going to take care of furniture in exactly the same way. As it relates to, while I was sitting, as it relates to the differences, again, as it relates to justice argument of disparage treatment, an example we cite to in our brief is in one instance, the source selection authority points to APOMR in its submission and for the first, because some of these questions appear three times. The first time the question appears as it relates to a staffing plan, the source selection authority afforded APOMR on its zero points. The second, and pointed to the deficiencies, the second two times under staffing plan that that appears in the rubric, the scoring rubric, which is where this whole 39 points came to, it afforded APOMR on its two points in each of those two instances for the exact same answer. And that same situation, so they cleaned four points for their staffing plan and office design group cleaned zero for essentially for what was pointed out by the source selection authority as the same deficiencies. As it relates to, and again, it's done a number of times in our briefing, and again, where we disagree with the trial court, with trial court's analysis is that many of the awardees responses to these were simply, were in strict violation of the evaluation criteria, doing nothing more than parroting back what the evaluation criteria require. I'm out of time. Thank you, counsel. The case is submitted. Thank you. All rise. The honorable court is adjourned from day today.